In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-00-483 CR


____________________



CLIFFORD HORN, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 159th District Court


Angelina County, Texas


Trial Court No. 21,540






O P I N I O N


 A jury convicted Clifford Horn of manslaughter. See Tex. Pen. Code Ann. §
19.04 (Vernon 1994). He was sentenced to fifteen years imprisonment. Horn challenges
his conviction on the grounds that the evidence was legally and factually insufficient, that
the jury was not sworn prior to voir dire, and that the trial court improperly admitted
testimony concerning extraneous offenses.


The Evidence

 Horn's third point of error challenges the legal and factual sufficiency of the
evidence. We will review this point of error first, since a finding of legal insufficiency
would entitle Horn to acquittal. See Moron v. State, 779 S.W.2d 399, 403 (Tex. Crim.
App. 1985). 

 In evaluating the legal sufficiency of evidence, we view the evidence in the light
most favorable to the verdict and determine whether any rational trier of fact could have
found the essential elements of the offense beyond a reasonable doubt. See Jackson v.
Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In reviewing a
factual sufficiency challenge, we conduct a review of all the evidence, both for and against
the finding, to determine whether proof of guilt is so obviously weak as to undermine
confidence in the jury's determination. See King v. State, 29 S.W.3d 556, 563 (Tex.
Crim. App. 2000). In addition, we ask if the proof of guilt, although adequate if taken
alone, is greatly outweighed by contrary proof. Id. "[W]e will reverse the fact finder's
determination only if a 'manifest injustice' has occurred." Id. (footnote omitted). 

 Appellant Clifford Horn and his "distant cousin," Joel Winn, went to the home of
Martin Ocon on March 25, 2000. A confrontation between Winn and Ocon escalated into
a gunfight between Horn and Ocon, both of whom admitted shooting at each other. In the
process, Winn and Horn were wounded and Cornelio Retana, who was married to Ocon's
niece, was killed. In reviewing the sufficiency of the evidence, we summarize the
testimony of the primary witnesses for both Horn and the State. 

Dr. James Bruce

 Dr. Bruce performed the autopsy on Retana. He testified that Retana suffered a
bullet wound to the right upper chest which penetrated his trachea, the main artery on the
left side of his neck, and his left lung. The injuries to the artery and lung caused death
from blood loss. Dr. Bruce testified that, assuming Retana was wearing a shirt when shot,
he could not discern how far the gun was from his chest when the shot was fired. 

Martin Ocon

 On March 25, the victim, Cornelio Retana, was at Ocon's house to ride horses. 
Horn arrived at Ocon's home with another man, later identified as Horn's "distant cousin,"
Joel Winn. Horn was driving a small car. Ocon had never seen appellant before, but
knew his passenger. The passenger [Winn] asked Ocon if he wanted to buy a dog; Ocon
declined.

 The car followed Ocon up his driveway, and the passenger began cursing him. 
Ocon told the men to leave "a lot of times" and then obtained a revolver from a shed. The
passenger [Winn] began to get out of the car, threatening to make Ocon "eat" the pistol. 
Retana grabbed the passenger and tried to push him back in the car. The passenger was
seated in the car with one foot out on the ground, slapping at Retana. Retana's head and
chest were inside the car. Horn then shot Retana "real close", and Retana went
backwards. Ocon then shot at Horn, and Horn shot at Ocon. Ocon threw his gun into the
woods and told police who arrived the night of the shooting that he did not know how
Retana had been killed. Two days later he went to the sheriff's office and told the full
story to an investigator. 

Adelaido Ocon

 Adelaido Ocon, Martin Ocon's brother, was Retana's father-in-law. He testified
that on the afternoon of the shooting two men arrived at Martin Ocon's house in a car
driven by Horn. He heard "the other guy" talking loudly to Martin Ocon, and Martin
telling the men to leave. Then the passenger opened the car door, and Adelaido saw that
the passenger had a gun by his ankle. Retana began pushing the passenger and telling him
to go. 

 The passenger slapped Retana three or four times. The driver shot Retana with a
pistol held in the driver's right hand and began shooting at Martin Ocon. Adelaido stated
that Horn could not have been firing at Martin Ocon when he shot Retana; the gun was
"more or less two feet" from Retana when Horn shot him. Adelaido testified that Retana
did not have a gun that day. 



Other Witnesses

 The court also heard from Maria, Angelica and Dina Ocon, who are respectively
the wife, daughter, and daughter-in-law of Martin Ocon. Dina was indoors when she
heard the first shot; Maria and Angelica were outdoors but out of sight of the car when
they heard the first shot. None saw Retana shot, but all testified that after they heard the
initial shot they saw Retana moving backwards and Martin Ocon exchanging shots with the
driver of the car. Angelica and Dina identified Horn; Maria acknowledged that "I never
did see him." 

Deputy Alan Hill

 Deputy Hill went to a local emergency room when told that people possibly
involved in the shooting were there. In the trauma room he encountered Horn, who said
that he had been shot while he was asleep. 

 Investigator Mike Jinkins

 Investigator Jinkins spoke to Horn at the hospital on March 29, four days after the
shooting. Initially, Horn told Jinkins that he had been driving, but had been asleep when
shot and did not know how Retana was shot. Neither Horn nor Winn expressed any desire
to file charges against whoever shot them, and neither contacted him after being released
from the hospital. 

 Jinkins testified that Martin Ocon came to the sheriff's office on two occasions, the
first time two days after the shooting to speak to Jinkins and Investigator Torres. In those
conversations, Ocon admitted lying to police the night of the shooting, and then gave a
version of the shooting largely identical to the one he testified to in court. 

Joel Winn

 Winn was the passenger in Horn's car the afternoon of the shooting. He testified
that after arguing with Martin he got in Horn's car to leave. He saw Ocon holding a gun 
and told Horn to stop the car. Winn got out of the car and Ocon pointed the gun at him. 
Winn re-entered the car and closed the door. He testified "the other guy" (Retana) opened
the door and tried to pull him out. Then Martin Ocon shot both Winn and Horn. Winn
testified that Retana continued trying to pull him from the car after Martin Ocon began
shooting. Winn said that he did not see Retana shot, although he did think that Horn fired
one or two shots. 

Clifford Horn

 Horn testified that he gave Winn a ride to Martin Ocon's property. As they were
leaving, Winn told him to stop. Horn then saw Martin Ocon loading a pistol. Ocon
pointed the pistol at Winn, who was outside the car at the time. Ocon continued to point
the gun at Winn after Winn got back in the car. The passenger door opened and Retana
tried to grab Winn. Horn stated that he pulled his gun from under the seat, and Martin
Ocon "seen me going for my gun and that's when he started shooting." Horn testified he
fired twice, feared for his life, and believed there was "no doubt" Martin Ocon would have
killed him. But Horn also acknowledged he never saw Retana with a gun and never heard
him make any threats. 

Sufficiency of Evidence


 The jury heard testimony that Horn shot Retana. Reconciliation of any conflicts in
the testimony of witnesses is within the province of the jury. See Rachal v. State, 917
S.W.2d 799, 805 (Tex. Crim. App. 1996). The jury was entitled to judge the credibility
of the witnesses, and to believe all, some, or none of the testimony presented by the
parties. See Chambers v. State, 805 S.W.2d 459, 461 (Tex. Crim. App.1991). The jury
was instructed to convict Horn of manslaughter if they found beyond a reasonable doubt
that he recklessly shot Retana. A person acts recklessly: 

 [W]hen he is aware of but consciously disregards a substantial and justifiable
risk that the circumstances exist or the result will occur. The risk must be
of such nature and degree that its disregard constitutes a gross deviation from
the standard of care that an ordinary person would exercise under all the
circumstances as viewed from the actor's viewpoint. 


Tex. Pen. Code Ann. § 6.03(c) (Vernon 1994). Some of the evidence that Horn behaved
recklessly in Retana's death came from Horn's own testimony, including these exchanges
with the State on cross-examination:


 So Martin is standing right here and all of the sudden he starts
shooting at you?



 A. No, ma'am, not just all of the sudden.


 Q. What happened?


 A. He saw me reach for my gun.


 Q. He saw you reach for your gun?


 A. Yes, ma'am.



 And then he started shooting at you?

 
 Yes, ma'm.

 


 Q. So, if he's here and Cornelio is over here, how do you shoot
Cornelio?


 A. I don't know. I don't know.


 Q. They're not standing next to each other?


 A. No, ma'am.


 Q. So why do you shoot Cornelio instead of Martin?

 . . . .

 A. I don't know. 

 . . . .

 Q. It's your testimony that Martin shot first?

 A. Yes, ma'am.

 Q. And you don't know how you shot Cornelio? 

 A. I know how, but I didn't know that I shot Mr. Retana. And I
apologize.


 Q. You do know how or you don't know how you shot him?


 A. I know how I shot, but I don't know how he got shot. 


In this testimony, Horn seems to acknowledge that he shot Retana, and cannot explain how
or why he shot the admittedly unarmed Retana rather than the armed Ocon. 

 The evidence was legally sufficient and factually sufficient to permit the jury to find
beyond a reasonable doubt that Horn recklessly caused Retana's death. Point of error
three is overruled.

Juror Oath

 Horn's first point of error notes that the record does not show the jury panel being
sworn prior to voir dire. See Tex. Code Crim. Proc. Ann. art. 35.02 (Vernon 1989).
However, Rule 44.2(c)(2) of the Rules of Appellate Procedure provides that we are to
assume that the jury was "properly impaneled and sworn" unless the issue was raised in
the trial court or the record affirmatively shows the contrary. Tex. R. App. P. 44.2(c)(2). 
The issue was not raised in the trial court. Horn argues that the record "affirmatively
shows the contrary" because it does not reflect administration of the oath. In its brief, the
State contends that the jury panel was sworn in Angelina County's other district court for
voir dire in a civil case, then moved to the court below when it was not needed in the first
court. In light of Rule 44.2(c)(2)'s presumption that the jury was properly impaneled and
sworn, and in the absence of an affirmative contrary showing in the record, point of error
one is overruled.

Extraneous Offenses

 Horn argues that the trial court committed reversible error on two occasions by
allowing testimony about extraneous offenses. The first occasion was during the testimony
of Investigator Mike Jinkins. Jinkins testified that police seized approximately $1,250.00
in cash found in the car occupied by Horn and Winn at the time of the shooting. Jinkins
was asked on redirect why police had seized the money. Horn objected to the question as
having been asked and answered; the objection was overruled. Jinkins answered, "My
investigation revealed that Mr. Horn and Mr. -- or Mr. Winn had a current charge of
Delivery of Marijuana." Defense counsel asked to approach and objected on the grounds
that the question and answer violated the motion in limine. The trial court overruled the
objection, stating that (A) the motion in limine applied only to extraneous offenses by
Horn, not by Winn, and (B) that the defense had opened the door by asking Jinkins about
the seized money: "If you ask him, she can ask him." On recross, Horn's counsel led
Jinkins to clarify that it was Winn, not Horn, who had a pending drug charge. 

 Q. Mr. Jinkins, you just said that Clifford Horn has got pending drug
charges against him?


 A. I wasn't aware that Clifford Horn did.

 . . . .


 Q. Okay. Let's just make sure that everybody in this jury knows it and
knows it right. Mr. Horn is not under investigation or charged at this
time or any other time for any type of marijuana or dope dealing,
right?


 A. I'm not aware of any, no, sir. 


 The trial court correctly ruled that the defense invited the testimony by asking 
questions about the police seizure of the money. In addition, Jinkins acknowledged that
Horn had no drug charges pending that he was aware of. 

 The second incident took place during the punishment phase. A juvenile probation
officer testified that Horn was placed on juvenile probation in November 1997 for
aggravated assault. Asked about other grounds for probation, she replied that Horn's
probation was extended in September 1998 for burglary of a habitation. Horn objected.
At the bench, the trial court reprimanded the State for "interject[ing] an offense that shows
no final conviction" and ordered the State to "get off" the topic of unadjudicated offenses,
but refused Horn's request for a mistrial. The defense did not request an instruction for
the jury to disregard the testimony. Horn argues that the refusal to grant a mistrial was
reversible error. 



 Admissibility of punishment evidence is governed by the Texas Code of Criminal
Procedure, specifically that part of art. 37.07 which allows for the admission of evidence
relating to a defendant's adjudication of delinquency for felonies and for misdemeanors
punishable by jail confinement. See Tex. Code Crim. Proc. Ann. art. 37.07 § 3(a)(1)(i)
(Vernon Supp. 2002). Clearly, the adjudication of delinquency order for the felony
offense of aggravated assault falls within the language of art. 37.07(3)(a)(1)(i). 

 Horn claims the evidence should not be admitted because the State did not clearly
prove he committed the acts. The trial court's threshold determination of admissibility is
based on relevancy, not on a reasonable doubt determination, and is reviewed by this Court
under an abuse of discretion standard. See Mitchell v. State, 931 S.W.2d 950, 952-53
(Tex. Crim. App. 1996). In Huizar v. State, 12 S.W.3d 479, 482 (Tex. Crim. App. 2000)
(op. on reh'g), the Court of Criminal Appeals further explained that "[a]rticle 37.07's
requirement that extraneous-offense and bad-act evidence must be proven beyond a
reasonable doubt is an evidentiary rule; it has no constitutional underpinnings." Here the
jury was properly instructed that it could not consider extraneous offenses in assessing
punishment unless it first found the defendant did in fact commit the offense beyond a
reasonable doubt. The jury is presumed to have followed the court's charge. See Gaemz
v. State, 737 S.W.2d 315, 324 (Tex. Crim. App. 1987). 

 Horn also argues that the admission of the extraneous acts is more prejudicial than
probative. See Tex. R. Evid. 403. We disagree. The State offered the evidence to
demonstrate that appellant, who had filed an application for probated sentence, was not a
good candidate for probation. We find the evidence showing appellant had previously been
on probation and was now before the court on another charge was probative of the issue
of lack of suitability for probation, and not more prejudicial than probative. Issue two is
overruled.

 We affirm the judgment of the trial court.

 AFFIRMED.

 __________________________________

 DAVID B. GAULTNEY 
 Justice


Submitted on February 12, 2002

Opinion Delivered May 15, 2002

Do Not Publish


Before Walker, C.J., Burgess, and Gaultney, JJ.